UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| JERRY SUMMERS | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. 3:14-cv-1362 |
| | § | |
| BAYLOR REGIONAL MEDICAL CENTER | § | DEMAND FOR JURY TRIAL |
| AT PLANO AND CHRISTOPHER | § | |
| DUNTSCH, M.D. | § | |
| | § | |
| Defendants. | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES Jerry Summers ("Plaintiff" or "Summers") complaining of Defendants Baylor Regional Medical Center at Plano ("Baylor") and Christopher Duntsch, M.D. ("Duntsch") (collectively "Defendants"), and for cause of action would respectfully show as follows:

**I.
PARTIES**

1.     Plaintiff Jerry Summers is an individual citizen of Tennessee currently residing in Memphis, Tennessee.

2.     Defendant Baylor Regional Medical Center at Plano is a nonprofit corporation organized in the State of Texas. Its registered office, with the Texas Secretary of State, is 2001 Bryan Street, Suite 2300, Dallas, Texas 75201-3063. It may be served with process through its registered agent, C T Corporation System, 1999 Bryan St., Ste. 900, Dallas, TX 75201-3136.

3. Christopher Duntsch, M.D, is an individual citizen of Colorado. He may be served with process at his usual place of residence, 1525 E Jamison Place, Centennial, Colorado 80122, or wherever he may be found.

## II.
## STATUTORY NOTICE

4. On or about January 29, 2014, Plaintiff provided notice to Defendant Baylor Regional Medical Center at Plano, pursuant to Texas Civil Practice & Remedies Code Section 74.051, that Plaintiff intended to assert a health care liability claim arising out of the health care that it provided to him. Pursuant to the statute, this timely notice tolled the statute of limitations as to all potential defendants by 75 days. Plaintiff also provided to Defendant Christopher Dunstch, M.D. prior to filing this complaint.

## III.
## JURISDICTION AND VENUE

5. Pursuant to 28 U.S.C. § 1332, this Court has jurisdiction over this matter because there is complete diversity of citizenship of the parties and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

6. Venue is proper because Baylor Regional Medical Center at Plano is a Texas nonprofit corporation whose registered address is located in Dallas County, Texas.

## IV.
## DUTIES

7. At all times relevant hereto, Defendants held themselves out to Plaintiff and to the public at large as qualified to provide hospital, nursing and physician care within the standard of care, and in this capacity offered services to Plaintiff.

8. At all times material hereto, there were health care provider-patient relationships between Defendants and Plaintiff.

## V.
## STATEMENT OF FACTS

9. In late 2010, Christopher Duntsch, M.D. completed a six year residency and fellowship in neurosurgery in Tennessee. For approximately one year and a half following completion of his training, Dr. Duntsch did research in a laboratory and did not perform surgeries on patients.

10. In 2011, Baylor interviewed and then successfully recruited Dr. Duntsch to perform neurosurgery at its facility, in a convoluted arrangement involving three interlinked contracts that were all executed on July 1, 2011.

11. The first contract was a "Physician Practice Start-Up Assistance Agreement" ("Baylor Agreement"), which Baylor entered into with Dr. Duntsch and The Minimally Invasive Spine Institute of Dallas ("Spine Institute").

12. In the Baylor Agreement, Baylor explained that its purpose was to ". . . induce the Physician to relocate to the Hospital Service Area and to join the Hospital's Medical Staff . . . ."

13. Indeed, the Baylor Agreement induced Dr. Duntsch to move to Dallas and practice at its facility by Baylor promising to: (1) pay him up to $15,000.00 for relocation expense; (2) pay for a year's worth of his "operating expenses" not to exceed $44,000.00 per month; (3) guarantee that he would receive $50,000.00 per month in income for the first year of his practice at Baylor; and (4) advance $600,000.00 to the Spine Institute, on behalf of Dr. Duntsch.

14. The second contract was a "Physician's Services Agreement" ("MISI Agreement") between MISI and Dr. Duntsch, which was specifically conditioned upon execution of the "Physician Recruitment Agreement" by Baylor, Dr. Duntsch and MISI.

3

15. The MISI Agreement promised Dr. Duntsch a base salary of $600,000.00 per year, as well as bonuses of 40 percent of all gross collections by MISI for Dr. Duntsch's billings in excess of $800,000.00.

16. Although the initial term of the MISI Agreement was two years, with provisions for automatic renewals, MISI retained the right to terminate it immediately if Dr. Duntsch became unable to perform his duties because of a physical or mental incapacity.

17. The third contract was a promissory note executed by Dr. Duntsch and MISI, unconditionally promising to pay Baylor the principal sum of $600,000.00 plus interest. The promissory note would have matured on the first anniversary of the note, July 1, 2012, but included provisions that fully forgave the debt, so long as Dr. Duntsch kept operating on patients at Baylor.

18. In addition to its significant cash outlays to Dr. Duntsch and MISI, Baylor hired marketing personnel, paid for advertising to drum up new patients for Dr. Duntsch and provided him with office space. Baylor also encouraged the physicians on its medical staff to refer patients to Dr. Duntsch for neurosurgery.

19. MISI terminated its contract with Dr. Duntsch on September 27, 2011, because of disagreements over patient care. Based on information and belief, one of the owners of MISI, Michael Rimwali, M.D. advised Baylor of his concern that Dr. Duntsch was impaired because of substance abuse and/or mental illness. Nevertheless, Baylor allowed Dr. Duntsch to continue to perform neurosurgery on patients at its facility after receiving this information from Dr. Rimwali. Upon further information and belief, other healthcare providers practicing at Baylor shared similar concerns about Dr. Duntsch around this same time period and yet, Baylor allowed

Dr. Duntsch to keep operating on patients without providing any safeguards to prevent harm to its patients.

20. On February 2, 2012, Dr. Duntsch took Jerry Summers to surgery at Baylor, for anterior discectomy at C3-C4 and C4-C5, interbody fusions at the same cervical levels and instrumentation with an anterior cervical plate with screws from C3 to C5.

21. During the surgery, there was an extensive amount of bleeding, which Dr. Duntsch attempted to control intraoperatively by packing excessive amounts of haemostatic agents (Gelfoam) within the spinal canal and neural foramina as well as extending behind the C3 and C4 vertebral bodies. This caused compressive and concussive trauma to Mr. Summers's spinal cord.

22. After the surgery, Mr. Summers awoke from anesthesia in the post-anesthesia care unit (PACU) and could not move his extremities. Dr. Duntsch was aware of this finding, but did not see Mr. Summers and chose to wait hours before ordering imaging and other testing. Dr. Duntsch did not order imaging studies or make plans to return to the operating room to address the paralysis upon learning that Mr. Summers could not move his arms and legs but instead instructed the PACU and intensive care unit (ICU) nurses to do nothing but monitor the patient for a couple of hours before doing anything to address this medical emergency. The nursing staff in the PACU and ICU did not advocate for Mr. Summers or invoke the chain of command to get him urgent medical attention.

23. Although Mr. Summers was eventually taken back to surgery that day, the delay made his condition irreversible and he is now in a permanent quadriplegic state.

24. Because a number of horrific patient outcomes, including quadriplegia and death, the Texas Medical Board suspended Dr. Duntsch's license to practice medicine on June 26,

2013. Some of these tragic outcomes had occurred before the surgery on Mr. Summers. On December 6, 2013, Dr. Duntsch entered into an agreed order to revoke his medical license, in lieu of additional disciplinary proceedings against him.

## VI.
## CLAIMS FOR RELIEF

**A.     Baylor Regional Medical Center at Plano:  Nursing Negligence**

25.     Defendant Baylor Regional Medical Center at Plano, individually and/or by and through its agents, servants, representatives and/or employees, committed acts and/or omissions that constitute negligence, as that term is defined by law, in the course of rendering nursing and health care to Plaintiff, beginning on February 2, 2012, including:

(1)  Failure of the operating room nurses to advocate for Plaintiff by reporting to their nursing supervisor when there was excessive blood loss during the initial surgery, and failure to document such findings and notification.

(2)  To the extent that Dr. Duntsch was behaving unusually during the first surgery, including, but not limited to, proceeding without current physical and imaging in the medical record in violation of policies and procedures, the operating room nurses failed to advocate for Plaintiff by reporting and documenting such behavior and reporting to their nursing supervisor.

(3)  Failure of the post-anesthesia care unit (PACU) nurses to accurately identify and report to their nursing supervisor, advocate for immediate physician evaluation, and document the same, when Plaintiff woke up from anesthesia, following the first surgery, and was unable to move his extremities.

(4)  Failure of the intensive care unit (ICU) nurses to accurately identify and report to their nursing supervisor, advocate for immediate physician evaluation, and document the same, when Plaintiff was unable to move his extremities, following the first surgery.

26. This Defendant is liable under the doctrine of *respondeat superior*, and/or other agency principles for its employees, representatives, and/or agents.

27. This Defendant additionally and/or in the alternative, at all material times, had the right to control the means and details of its employees, representatives, agents, ostensible agents and/or borrowed servants.

28. The above-mentioned acts and/or omissions of this Defendant at Plano proximately caused the incident in question and the damages of Plaintiff herein.

**B.     Baylor Regional Medical Center at Plano:  Malicious Credentialing**

29. Defendant Baylor Regional Medical Center at Plano should not have allowed Dr. Duntsch to operate on Plaintiff on February 2, 2012, based on its actual knowledge that Dr. Duntsch practiced medicine in an unsafe manner. Thus, Defendant Baylor Regional Medical Center at Plano committed the tort of malicious credentialing, in that it had a specific intent to place money over patient safety, even though it would cause substantial injury or harm to Plaintiff. *See Romero v. KPH Consol., Inc.*, 166 S.W.3d 212 (Tex. 2005).

30. The above-mentioned malicious credentialing of this Defendant proximately caused the incident in question and the damages of Plaintiff herein.

**C.     Baylor Regional Medical Center at Plano:  Negligence of Dr. Duntsch**

31. On July 1, 2011, Defendant Baylor Regional Medical Center at Plano entered into contracts with Dr. Duntsch and The Minimally Invasive Spine Institute of Dallas, under which Defendant Baylor Regional Medical Center at Plano provided lavish compensation for Dr. Duntsch. Defendant Baylor Regional Medical Center at Plano then hired advertising personnel, purchased advertising to induce patients to choose Dr. Duntsch to perform surgeries at its facility and provided him with office space. By virtue of these arrangements, Dr. Duntsch was an agent,

servant, representative and/or employee, of Defendant Baylor Regional Medical Center at Plano, making it vicariously liable for Dr. Duntsch's negligence, which is more fully described in paragraph 35, *infra*.

32. This Defendant is liable under the doctrine of *respondeat superior*, and/or other agency principles for its employees, representatives, and/or agents.

33. This Defendant additionally and/or in the alternative, at all material times, had the right to control the means and details of its employees, representatives, agents, ostensible agents and/or borrowed servants.

34. The above-mentioned acts and/or omissions of this Defendant proximately caused the incident in question and the damages of Plaintiff herein.

**D.    Defendant Christopher Duntsch, M.D.**

35. Defendant Christopher Duntsch, M.D., in the course of rendering medical care and treatment to Jerry Summers, beginning on February 2, 2012, committed acts and/or omissions that constitute negligence, as that term is defined by law, including:

> (1) Failure to control bleeding during Plaintiff's initial surgery without adding further undue compression to neural elements. During the surgery, Dr. Duntsch caused intraoperative compressive and concussive trauma to the spinal cord by packing excessive amounts of haemostatic agents (Gelfoam) within the spinal canal and neural foramina as well as extending behind the C3 and C4 vertebral bodies.
>
> (2) Failure to recognize a post-operative complication following the initial surgery, take appropriate steps to rapidly and accurately identify the cause of the complication and immediately correct undue spinal cord compression if that has occurred. When the Plaintiff awoke from surgery and unable to move his extremities, Dr. Duntsch failed to make an immediate and accurate diagnosis of the cause of this unexpected post-operative, catastrophic complication. He also failed to order a stat

        lateral cervical spine x-ray to rule out hardware retropulsion, failed to order stat CT and/or MRI scans in order to identify ongoing spinal cord compression, failed to immediately order preparation of an operating room, and failed to take Mr. Summers back to surgery on an emergent basis within 2 hours after having identified ongoing spinal cord compression.

  (3)    Failure to make a correct diagnosis when faced with postoperative quadriplegia, following the initial surgery. Dr. Duntsch further failed to correctly identify the anterior compressive pathology, namely blood clot and haemostatic agents, and failed to perform emergent and accurate surgery to correct the ongoing and more extensive anterior spinal cord compression.

  (4)    Failure to utilize proper neurosurgical technique, during the initial surgery, which requires resection of the minimal amount of cervical vertebral body necessary to adequately decompress the spinal cord and nerve roots.

36.    The above-mentioned acts and/or omissions of this Defendant proximately caused the incident in question and the damages of Plaintiff herein.

## VII.
## DAMAGES

37.    Plaintiff would show that, as a direct and proximate result of the negligent acts and/or omissions of the Defendants as set out above, he has suffered the following damages:

  (a)    Permanent quadriplegia;

  (b)    Severe and permanent physical and neurological damage;

  (c)    Extensive medical (including all health and therapy care) expenses in the past, which will, in all reasonable probability, continue into the future until his death;

  (d)    Great physical pain and suffering, mental pain and anguish in the past, which will, in all reasonable probability, continue into the future until his death;

 (e) Severe and permanent physical impairment and disfigurement in the past, which will, in all reasonable probability, continue into the future until his death;

 (f) Lost earnings in the past;

 (g) Loss of earning capacity, which will, in all reasonable probability, continue into the future until his death;

38. Plaintiff has been greatly injured and damaged in an amount that is within jurisdictional limits of this Court for which he now pleads.

## VIII.
## JURY DEMAND

39. Plaintiff respectfully requests a trial by jury.

## IX.
## CHAPTER 74 EXPERT REPORT AND CURRICULUM VITAE

40. Pursuant to Texas Civil Practice & Remedies Code Section 74.351, Plaintiff timely attaches and serves on Defendants the following Chapter 74 expert report and curriculum vitae, in the above-referenced matter, which are attached hereto and incorporated by reference:

 **Exhibit A** Chapter 74 Expert Report of Martin L. Lazar, M.D.

 **Exhibit B** Curriculum Vitae of Martin L. Lazar, M.D.

## X.
## PRAYER

41. Plaintiff Jerry Summers prays that Defendants Baylor Regional Medical Center at Plano and Christopher Duntsch, M.D. be cited to appear and answer herein and that upon final hearing of this case, Plaintiff have judgment of and against Defendants for Plaintiff's actual damages, together with pre- and post- judgment interest thereon at the highest rate allowed by law, compensatory damages as set forth above, costs of Court, and for such other and further

relief, both general and special, both at law and in equity, to which Plaintiff may show himself justly entitled.

        Respectfully submitted,

        PAINTER LAW FIRM PLLC

By: _____
        Robert W. Painter
        Texas Bar No. 24013284
12750 Champion Forest Drive
Houston, Texas 77066
Telephone: 281-580-8800
Facsimile: 281-580-8802
Email: rpainter@painterfirm.com

        Jeffrey S. Rosenblum
        Rosenblum & Reisman PC
Triad Centre III
6070 Poplar Avenue, Fifth Floor
Memphis, Tenneessee TN 38119
Telephone: 901-527-9600
Facsimile: 901-527-9620
Email: jeffr@randrfirm.com

        James B. Lees, Jr.
        Hunt & Lees, L.C.
West Virginia Bar No. 2176
2306 Kanawha Blvd. East
Charleston, West Virginia 25311
Telephone: 304-344-9651
Facsimile: 304-343-1916
Email: leesgov@citynet.net

**ATTORNEYS FOR PLAINTIFF,
JERRY SUMMERS**